**United States District Court**
For the Northern District of California

1

2

3

4

5                       UNITED STATES DISTRICT COURT

6                       NORTHERN DISTRICT OF CALIFORNIA

7

8    FRED NAZIF,                                No. C-13-5498 EMC

9            Plaintiff,                         **ORDER (1) GRANTING DEFENDANT'S**
                                                **MOTION FOR SUMMARY**
10       v.                                     **JUDGMENT; (2) DENYING AS MOOT**
                                                **PLAINTIFF'S MOTION FOR PARTIAL**
11   COMPUTER SCIENCES CORPORATION,             **SUMMARY JUDGMENT; AND (3)**
                                                **DENYING AS MOOT PLAINTIFF'S**
12           Defendant.                         **MOTION FOR JUDGMENT ON THE**
     _____/          **PLEADINGS**
13
                                                **(Docket Nos. 66, 67, 71)**
14

15

16                           I.    **INTRODUCTION**

17           Plaintiff Fred Nazif brought this action against his former employer, Defendant Computer

18   Sciences Corporation (CSC), alleging that his employment was terminated in retaliation for making

19   internal reports of alleged securities law violations and/or refusing to participate in CSC's unlawful

20   activities.  *See* Docket No. 39 (Second Amended Complaint).  Nazif's operative complaint contains

21   three causes of action: (1) whistleblower retaliation in violation of Section 21F of the Dodd Frank

22   Act (Dodd Frank or DFA); (2) retaliatory termination in violation of California Labor Code §

23   1102.5; and (3) wrongful termination in violation of public policy.

24           Pending before the Court is CSC's motion for summary judgment.[1]  Docket No. 71.  After

25   reviewing the briefs and considering the views expressed during extended oral argument on this

26   _____

27           [1] Also pending before the Court is Plaintiff's motion for partial summary judgment and
     Plaintiff's motion for judgment on the pleadings.  Docket Nos. 66-67.  Because the Court grants
28   Defendant summary judgment, and thereby resolves this case in its entirety, the Plaintiff's pending
     motions are hereby denied as moot.

**United States District Court**
For the Northern District of California

matter, the Court concludes CSC is entitled to summary judgment on all three of Nazif's asserted claims. As explained in more detail below, Nazif submitted insufficient evidence that he actually engaged in a protected activity (*i.e.*, blew the whistle) to recover under Dodd Frank, because there is no evidence that his subjective belief that CSC violated securities laws was objectively reasonable. More specifically, Nazif's DFA claim fails because he did not submit evidence from which a reasonable juror could conclude that Nazif reported *material* securities law violations to his supervisors. Nazif's California Labor Code cause of action fails because he presented no evidence that he refused to participate in an activity that would violate a federal or state statute or regulation, as required to maintain a retaliation claim under section 1102.5(c). And Nazif's wrongful termination in violation of public policy claim necessarily fails because it is derivative of his first two causes of action.

## II.   BACKGROUND

Plaintiff Fred Nazif has been a Certified Public Accountant since the mid-1990s. Docket No. 82-7 (Nazif Decl.) at ¶ 3. During this time, Nazif has provided accounting and auditing services mostly to large "high-tech" companies like Hewlett Packard and Defendant CSC. *See id.* at ¶ 4-8. Nazif has "gained extensive experience in public company accounting issues, particularly as it relates to accounting for high tech companies and revenue recognition" including "extensive knowledge of US GAAP [(Generally Accepted Accounting Principles)]." *Id.* at ¶ 9.

Nazif was hired by CSC in July 2012 to serve as a Technical Accounting Director. Docket No. 82-13 at 313. According to Nazif, he was "aware that CSC had settled a securities fraud class action for $97.5 million the previous December," but he was assured during his interview that "CSC was taking corrective action." Nazif Decl. at ¶ 12. Nazif's job duties included providing "technical accounting support for significant transactions," reviewing "the application of revenue recognition guidance for new and existing contracts," and ensuring the "accuracy of financial statements." Docket No. 71-4 at 12. Nazif was initially assigned to report to April Hand, a fellow accountant at CSC. *Id.*

During the time that Nazif reported to Hand, Nazif apparently became aware of what he believed to be errors in CSC's accounting practices. Nazif's concerns were five-fold. The first

**United States District Court**
For the Northern District of California

1    concern was about certain 2006 contracts with Abbott Labs (Abbott Contracts).  During a joint

2    conference call with other audit staff, an audit staff member (not Nazif) noticed a mistake in the

3    accounting treatment under the Abbott Contracts.  Nazif Decl. at ¶ 17.  Hand adjusted the accounting

4    treatment for the Abbott Contracts, but Nazif claims that Hand's adjustment was "incorrect" because

5    she took two contracts that were worth more than $1 million in total, and "split the two contracts and

6    adjusted them separately."  *Id.*  Nazif claims that he believes Hand "did that to avoid having to make

7    an out of period adjustment."  *Id.*

8         After learning of the improper accounting treatment in the Abbott Contracts, Nazif states that

9    he became "concerned" that the issue had gone unspotted for six years.  Nazif Decl. at ¶ 19.  While

10   Nazif now acknowledges that the Abbott Contracts had been signed by another company that was

11   later acquired by CSC (hence, CSC's auditors would not have reviewed the contracts at the time the

12   predecessor entity signed them in 2006), in 2012 he was concerned that there might be other existing

13   contracts that contained similar accounting errors that had gone unspotted by CSC accountants.  *Id.*

14   Consequently, Nazif suggested to Hand that she "review other contacts to determine whether the

15   issue was widespread."  *Id.*  He also informed Hand that he believed her accounting adjustment for

16   the Abbott Contracts was "incorrect."  *Id.*  Nazif admits that Hand inquired within CSC whether the

17   identified accounting issue was a "common" problem in prior contracts, and indicates that Hand was

18   reassured that it was not.  *Id.*  Nevertheless, Nazif claims that Hand's inquiry was insufficient under

19   GAAP because her investigation consisted of calling and receiving assurances from "the same

20   business unit that did not notice the issue [in the Abbott] contract[s] for six years."  *Id.*  According to

21   Nazif, this inquiry was not GAAP compliant because "accountants are expected to use professional

22   skepticism when exercising their judgment."  *Id.*  Nazif alleges that a GAAP compliant investigation

23   into the contract issue would have taken significantly longer than the investigation Hand undertook.

24   *Id.*  Nazif claims that Hand stopped communicating with him about Abbott Labs after he raised his

25   concerns with her.  *Id.*

26        Nazif's second concern was with improper accounting treatment relating to a contract with

27   Arc Insurance.  Nazif Decl. at ¶ 20.  According to Nazif, revenue was being recognized under the

28

1    Arc contract improperly, but when he "contacted Ms. Hand about it, she told me that we should not

2    rock the boat, and took me off the job" reviewing the Arc contract. *Id.*

3        The third accounting problem Nazif observed was with a type of accounting treatment called

4    Vendor Specific Objective Evidence, or VSOE. Nazif Decl. at ¶ 21. According to Nazif, CSC was

5    using VSOE to recognize revenue on certain contracts, but was not doing so consistently with

6    GAAP best practices. *Id.* Moreover, while Nazif knew that CSC had recently adopted new VSOE

7    policies before he began working for the firm, he was concerned that "most of the business units

8    were not aware that there was a new checklist" containing the proper VSOE procedures, and thus the

9    new procedures were not being consistently followed. *Id.* at ¶ 24.

10        The fourth accounting issue Nazif observed related to CSC's practice of "capitalizing routine

11    research, development, and maintenance." Nazif Decl. at ¶ 25. According to Nazif, "in order to

12    capitalize a software development cost" under GAAP, the company must be assured that the

13    development cost either "significantly increases the marketability of the product; or [] extends its

14    useful life." *Id.* Nazif apparently "personally observed Ms. Hand approve issues for capitalization

15    based on bald assertions" that a software development "extended the useful life of the product." *Id.*

16    Nazif also apparently "observed Ms. Hand approve capitalization before she received the supporting

17    documentation." *Id.* Hand told Nazif we "should be rubberstamping these capitalization costs" but

18    when Nazif "refused to do so . . . she reassigned the work." *Id.* at ¶ 26.

19        Finally, Nazif states that he was concerned that CSC did not have a "global contract

20    database" where employees could go to access all of CSC's contracts, and particularly contracts that

21    were "related" to those contracts being considered for a particular accounting treatment. Nazif Decl.

22    at ¶ 28. Rather, "the accounting team needed to rely on the business units to self-report whether

23    there were related contracts." *Id.* According to Nazif, this "is not a control that complies with

24    GAAP." *Id.* Nazif alleges that "I expressed my concern that this was an inadequate control to . . .

25    Ms. Hand." *Id.* Hand reports, however, that at no time during his employment did Nazif ever

26    "disclose[] to me that he believed any of CSC's accounting policies, procedures, or practices

27    violated any state or federal laws, or could lead to misstatements on CSC's required financial reports

28

United States District Court

For the Northern District of California

1   and disclosures." Docket No. 71-13 (Hand Decl.) at ¶ 31. Hand further declares that in her

2   experience, CSC's accounting "comport[ed] with U.S. GAAP." *Id.* at ¶ 32.

3            Sometime in November 2012, CSC reorganized its auditing group, and CSC's Chief

4   Accounting Officer, Michael Sweeney, became Nazif's direct supervisor. Docket No. 71-15

5   (Sweeney Decl.) at ¶¶ 5-6. On November 26, 2012, Sweeney phoned Nazif. *Id.* at ¶¶ 7-8.

6   According to Sweeney, he called Nazif to ask "what he was working on" and otherwise discuss

7   Nazif's job responsibilities for CSC. *Id.* at ¶¶ 6, 8. Sweeney avers that Nazif "did not respond

8   directly to my inquiries, and I left the call unable to understand what Mr. Nazif was working on or

9   what he considered his duties to be." *Id.* at ¶ 8.

10           Nazif remembers the November 26 call differently. According to Nazif, he expressed his

11  various concerns with CSC's accounting practices to Sweeney. Specifically, Nazif states that he

12  "complained to Michael Sweeney about the Abbott Labs situation," and that he variously "shared,"

13  "raised" and "expressed" his "concerns" regarding the other accounting practices described above.

14  *See* Nazif Decl. at ¶¶ 19, 23-24, 28. Nazif provided few additional details regarding *precisely* what

15  he told Sweeney, either in his declaration or during his deposition. *See, e.g.*, Nazif Depo. at 133:9-

16  141:21 (describing generally the four topics of conversation Nazif had with Sweeney but without

17  elaboration). Sweeney has testified that he "did not understand from Mr. Nazif" that what Nazif was

18  stating or suggesting on the November 26 call involved "any specific instances of, or systemic issues

19  of, improper accounting." *See, e.g.*, Sweeney Decl. at ¶ 9.

20           On November 27, Nazif sent Sweeney an email that began: "Dear Mike: It was a pleasure

21  talking with you the other day [Nov. 26th] and I am looking forward to take [sic] all the

22  assignments/responsibilities as you see fit under your direction, which might be the same or different

23  than I had been assigned by Ms. April Hand . . ." Sweeney Decl, Ex. 19 (first bracketed alteration in

24  original). The email went on to list the accounting papers he had reviewed and his other outstanding

25  tasks. Nowhere in the email did Nazif mention any accounting "issues" or problems. *Id.* Indeed, it

26  is largely undisputed that there is *no documentary evidence* in the summary judgment record

27  whatsoever of Nazif making complaints or otherwise informing Sweeney or Hand that he believed

28

United States District Court

For the Northern District of California

that CSC's accounting practices were fraudulent or materially violated any rule or procedure.[2]  It is

similarly undisputed that Nazif did not tell any other CSC personnel about his belief that CSC was

violating securities laws, nor did he alert outside enforcement agencies while he was still employed

by CSC.  *See* Nazif Depo. at 79:20-81:17 (admitting that he did not report any possible violations to

anyone other than Hand or Sweeney).

Toward the end of 2012, CSC "engaged in a major corporate-wide reorganization . . . meant

to cut costs and ensure the right people were in the right roles and the right locations."  Sweeney

Decl. at ¶ 15.  Sweeney was asked to "review the personnel in [his] group as a part of this exercise,

and understood [CSC's] charge to keep the better performers."  *Id.*  According to Sweeney, he spoke

with a number of individuals about Nazif's job performance.  *Id.* at ¶ 16.  Apparently, CSC staff had

"complained about Mr. Nazif" and stated that his "communication skills were poor . . . and that he

was not making a significant contribution."  *Id.*; *see also* Hand Decl. at ¶ 18.  Consequently,

Sweeney decided to fire Nazif.  Sweeney Decl. at ¶ 17.  Nazif disputes that he was a poor performer,

and contends that he was fired in retaliation for reporting potential securities law violations to

Sweeney and Hand.  The only evidence Nazif presents to support a finding of retaliatory intent is the

timing between his alleged internal reports of illegality (made in the Fall of 2012) and his

termination (in January 2013).

## III.   DISCUSSION

CSC moves for summary judgment on all three of Plaintiff's wrongful termination claims.

For the reasons explained below, the Court grants the motion.

A.    Summary Judgment Standard

The court may grant summary judgment "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed R.

---

[2]  Nazif has pointed to some documents as evidencing proof that he complained about certain practices to his superiors, but the Court finds that none of the documents bear this out.  For instance, when asked at his deposition about one such document that seemed to indicate Nazif's *agreement* with Hand's proposed accounting treatment, Nazif testified that when he wrote to Hand telling her that her accounting idea was "a good strategy," what he really meant to say was "that's improper."  *See* Nazif Depo. at 159:10-16.  (Q: So what you really meant by "that's a good strategy" is "that's improper"?  A: Yes).

United States District Court

For the Northern District of California

1    Civ. P. 56(a).  The court must view the evidence, and draw all reasonable inferences therefrom, "in

2    the light most favorable to the nonmoving party."  *Cameron v. Craig*, 713 F.3d 1012, 1018 (9th Cir.

3    2013).  An issue of fact is material if it has the potential to "affect the outcome of the case."

4    *Kasperzyk v. Shetler Sec. Servs., Inc.*, No. C-13-3358 EMC/TEH, 2015 WL 1348503, at *6 (N.D.

5    Cal. Mar. 25, 2015) (citations omitted).

6         When the moving party has carried its burden under Rule 56, "its opponent must do more

7    than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec.*

8    *Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, the party opposing

9    summary judgment must "come forward with specific facts showing that there is a *genuine issue for*

10   *trial* . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the

11   non-moving party, there is no genuine issue for trial."  *Id.* at 587 (internal quotation marks and

12   citations omitted) (emphasis in original); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

13   249-50 (1986) (holding that a party opposing summary judgment that has the burden of proof at trial

14   must come forward with sufficient probative evidence as to each element of the claim(s) on which it

15   bears the burden of proof); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626,

16   631 n.3 (9th Cir. 1987).

17   B.    Nazif's Dodd-Frank Act Claim Fails

18        Nazif's first claim is for whistleblower retaliation in violation of Section 21F of the Dodd-

19   Frank Act.[3]  *See* SAC at ¶ 35.  As this Court recently explained in great detail in *Somers v. Digital*

20   *Realty Trust*, Section 21F protects "whistleblowers" against retaliation where those individuals

21   undertake one or more of the protected activities listed in the statute.  *See Somers v. Digital Realty*

22   *Trust*, -- F. Supp. 3d --, 2015 WL 2354807, at *3-4 (N.D. Cal. May 15, 2015).  Here, Nazif concedes

23   that he did not report any alleged law violations to the SEC during his employment with CSC, and

24   so only subsection (iii) of Section 21F can apply to his claims.  *See id.*  As relevant here, that

25   subsection protects certain employees from retaliation for "making disclosures that are required or

26   protected under the Sarbanes-Oxley Act of 2002."  *See id.* at *4; 15 U.S.C. § 78u-6(h)(1)(A)(iii).

27   _____

28        [3]  Codified at 15 U.S.C. § 78u-6.

United States District Court
For the Northern District of California

1    CSC argues that Nazif's DFA whistleblower claim fails for two main reasons.  First, CSC

2    argues that Nazif is not a "whistleblower" as a matter of law because he did not make an external

3    report to the SEC.  Alternatively, CSC argues that Nazif has provided insufficient evidence that he

4    actually engaged in a protected activity (*i.e.*, blew the whistle).  Specifically, CSC argues that Nazif

5    presented insufficient proof that his subjective belief that CSC was engaging in securities law

6    violations was objectively reasonable.  While the Court recently rejected CSC's first argument,[4] the

7    Court finds that CSC's alternative contention has merit.

8    In order to prevail on his Dodd Frank claim, Nazif would need to present evidence that he

9    made disclosures to Sweeney or Hand that were either "required or protected" under Sarbanes-Oxley

10   (SOX).  Nazif acknowledges that none of his claimed disclosures were "required" under any

11   relevant law.  Rather, he claims his disclosures were "protected" under 18 U.S.C. section 1514A,

12   which is the SOX anti-retaliation provision.  The parties agree that in order to prevail on his DFA

13   claim, Nazif must prove that he *could* win a SOX anti-retaliation action brought directly under

14   section 1514A.  *See* Opp. Br. at 16.  Stated differently, to show that his disclosure was "protected"

15   under SOX, Nazif must show that he is entitled to the anti-retaliation protections of Sarbanes-Oxley.

16        1.    Nazif Has Not Made A Prima Facie Case Under Sarbanes-Oxley

17   Section 1514A prohibits publicly-traded companies from "discriminat[ing] against an

18   employee in the terms and conditions of employment" for "provid[ing] information . . . regarding

19   any conduct which the employee reasonable believes constitutes a violation of section 1341 [mail

20   fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the

21   Securities and Exchange Commission, or any provision of Federal law relating to fraud against

22   shareholders."  18 U.S.C. § 1514A(a)(1).  To make out a prima facie case for a violation of section

23   1514A, a plaintiff must establish that: (1) the employee engaged in a protected activity or conduct;

24   (2) the named person knew or suspected, actually or constructively, that the employee engaged in

25   the protected activity; (3) the employee suffered an unfavorable personnel action; and (4) the

26   _____

27        [4]  The Court rejects CSC's argument that Nazif cannot qualify as a whistleblower under the
     DFA because he did not make an external report to the SEC.  In so doing, the Court adopts its
28   reasoning in *Somers*.  *See* 2015 WL 2354807.

United States District Court
For the Northern District of California

1 | circumstances were sufficient to raise the inference that the protected activity was a contributing

2 | factor in the unfavorable action.  *See Van Asdale v. International Game Technology*, 577 F.3d 989,

3 | 996 (9th Cir. 2009) (citing 29 C.F.R. § 1980.104(b)(1)(i)-(iv)).  If the employee can satisfy these

4 | four elements, the burden shifts to the employer to demonstrate "by clear and convincing evidence

5 | that it would have taken the same adverse employment action in the absence of the plaintiff's

6 | protected activity."  *Id.*

7 | For the purposes of this motion, the Court assumes without deciding that Nazif has satisfied

8 | the final three elements of the prima facie test under SOX.  The Court concludes, however, that

9 | Nazif has failed to present sufficient evidence to support his contention that he satisfies the first

10 | element of the SOX test; namely, that he engaged in a protected activity or conduct.  *See Van Asdale*,

11 | 577 F.3d at 996.

12 | As noted above, section 1514A only prohibits discrimination against an employee for

13 | providing information "regarding any conduct which the employee *reasonably believes* constitutes a

14 | violation of" a listed law.  18 U.S.C. § 1514A(a)(1) (emphasis added); *see also Van Asdale*, 577

15 | F.3d at 1000.  Thus, as the Ninth Circuit has held, the "plain language of th[e] section, as well as the

16 | statute's legislative history and case law interpreting it, suggest that to trigger the protections of the

17 | Act, an employee must . . . have (1) a subjective belief that the conduct being reported violated a

18 | listed law, and (2) this belief must be objectively reasonable."  *Van Asdale*, 577 F.3d at 1000

19 | (citations omitted).[5]

20 | ————————————————

21 | [5] *Van Asdale* further holds that "to constitute protected activity under Sarbanes-Oxley, an 'employee's communications must 'definitively and specifically' relate to [one] of the listed

22 | categories of fraud or securities violations under 18 U.S.C. [] § 1514A(a)(1).'"  *Van Asdale*, 577 F.3d at 996-97 (quoting *Platone v. FLYi, Inc.*, 25 IER Cases 278, 287 (U.S. Dept. of Labor Sept. 29,

23 | 2006)).  In 2011 the ARB abrogated *Platone* – the decision to which *Van Asdale* deferred – "concluding that the 'definitively and specifically' test is 'inapposite' to the Sarbanes-Oxley

24 | whistleblower protection provision and in 'potential conflict with the express statutory authority of § 1514A,' which 'prohibits a publicly traded company from discharging or in any other manner

25 | discriminating against an employee for providing information regarding conduct that the employee 'reasonably believes' constitutes a SOX violation."  *Nielsen v. AECOM Technology Corp.*, 762 F.3d

26 | 214, 220 (2d Cir. 2014) (quoting *Sylvester v. Parexel Int'l LLC*, ARB No. 07-123, 2011 WL 2165854, at *14-15 (ARB May 25, 2011) (en banc)).  "The Board interpreted § 1514A to hew more

27 | closely to what its text expressly provides: that the plaintiff must have a subjective belief that the challenged conduct violates a provision listed in § 1514A, and that this belief must be objectively

28 | reasonable."  *Nielsen*, 762 F.3d at 221.  The Second Circuit decided that the ARB's latest interpretation of SOX was persuasive, and thus entitled to deference.  The Third Circuit has

**United States District Court**
For the Northern District of California

1    In order to "'have an objectively reasonable belief there has been shareholder fraud, the

2   complaining employee's theory of such fraud must at least approximate the basic elements of a

3   claim of securities fraud.'" *Van Asdale*, 577 F.3d at 1001 (quoting *Day v. Staples, Inc.*, 555 F.3d 42,

4   55 (1st Cir. 2009)).  For plaintiffs like Nazif, this means that there must be evidence the plaintiff had

5   an objectively reasonable belief that their employer's violations involved a "material

6   misrepresentation or omission, scienter, a connection with the purchase or sale of a security,

7   reliance, economic loss, and loss causation." *Id.* at 1001 (citing *Dura Pharms., Inc. v. Broudo*, 544

8   U.S. 336, 341-42 (2005)).  This test does not require Nazif to "prove that [CSC] officials actually

9   engaged in fraud." *Id.*  But an objectively reasonable accountant in Nazif's position would need to

10   believe that fraud occurred. *Id.*

11    Here, Nazif cannot satisfy the objective prong of the SOX test because he submitted

12   insufficient evidence to show that his "theory of fraud approximates a securities fraud claim." *Van*

13   *Asdale*, 577 F.3d at 1001.  Specifically, Nazif has cited no evidence that the GAAP violations he

14   complained of are "material" as that term is used in the context of a shareholder fraud cause of

15   action.  As the First Circuit explained in *Day*, the "materiality requirement means that the

16   complainant must believe there is a 'likelihood that the disclosure of the omitted fact would have

17   been viewed by the reasonable investor as having significantly altered the total mix of information

18   made available.'" *Day*, 555 F.3d at 57 (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32

19   (1988)).  Specifically in the context of GAAP violations, the Ninth Circuit has explained that such

20   violations are typically immaterial where they are "minor or technical in nature," and are material

21   where they "constitute[] widespread and significant inflation of revenue." *In re Daou Systems, Inc.*,

22   411 F.3d 1006, 1017 (9th Cir. 2005); *see also Nathanson v. Polycom, Inc.*, -- F. Supp. 3d --, 2015

23

24   similarly deferred to the ARB's more recent interpretation of SOX. *See Wiest v. Lynch*, 710 F.3d
25   121, 131 (3d Cir. 2013) ("We conclude that the ARB's rejection of *Platone's* 'definitive and
    specific' standard is entitled to *Chevron* deference.").  In the absence of Ninth Circuit authority
26   contrary to *Van Asdale*, the Court assumes that the "definitively and specifically" test still applies in
    this Circuit.  The Court believes that Nazif has not submitted sufficient evidence to meet the
27   "definitive and specific" standard articulated by the Ninth Circuit.  Ultimately, however, whether or
    not that portion of *Van Asdale* is still correct is irrelevant here, because Nazif cannot satisfy even the
28   lesser standard that requires that he held an objectively reasonable belief that CSC had violated the
    securities laws.

United States District Court

For the Northern District of California

1  WL 1517777, at *4 (N.D. Cal. Apr. 3, 2015) (holding that minor or technical GAAP violations are

2  quantitatively immaterial under Ninth Circuit law).

3       Despite the fact that he would have the burden to prove materiality at trial, Nazif made no

4  showing with respect to this element.[6]  In fact, what evidence Nazif has submitted undercuts any

5  potential inference of materiality.  For instance, with regards to the Abbott Contracts, Nazif declared

6  that the overall contract value between the two contracts was more than $1 million, but by splitting

7  the contracts up (*i.e.*, treating them as separate transactions, when they were truly related) Hand

8  avoided an "out of period adjustment" by making the contract value appear to be less than the $1

9  million threshold for such a report.  *See* Nazif Decl. at ¶ 18.  Notably, Nazif did not present the

10  Court with evidence regarding the impact on CSC's overall reported revenues that this inappropriate

11  accounting treatment might have had, if any.  Nor did Nazif present any evidence regarding how

12  wide ranging this particular alleged accounting impropriety was, assuming that it was more than an

13  isolated incident.  In any event, even if this Court assumes that the entire value of the Abbott

14  Contracts was improperly booked as revenue in a financial statement that was ultimately

15  disseminated to investors, a $1-2 million overstatement of revenue would be a "minor or technical

16  violation" that is not material to a company, like CSC, that submitted uncontroverted evidence that it

17  reported annual revenue of over $14 *billion* dollars during the period of Nazif's employment.[7]  *See*

18  *In re Daou Systems*, 411 F.3d at 1018 (explaining that "although overstatement of revenues in

19  _____

20      [6]  The Court notes generally in this regard that Nazif's briefing frequently makes factual
assertions without any record citations whatsoever.  And often where Nazif does include record

21  citations, the cited documents often do not support (or directly support) the corresponding statement
in Nazif's brief.  It is worth repeating the familiar refrain that "judges are not like pigs, hunting for

22  truffles . . . ."  *Independent Towers of Washington v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003)
(internal modification and citation omitted).

23

24      [7]  Cases recognize that in some circumstances a misstatement could be "material" as a
qualitative matter, even if the misstatement is not quantitatively significant.  *See Nathanson*, 2015

25  WL 1517777, at *4 (explaining that even if certain misstatements or omissions were "minor or
technical in nature . . . and thus quantitatively immaterial" the misstatement could nevertheless be

26  qualitatively material because "investors have a right to know – and would consider it important –
when the head of a publicly-owned company is stealing any quantity of money from their

27  company") (citations and internal modification omitted).  Nazif does not make this argument – he
makes no materiality argument at all – and there is no evidence or allegation that the misstatements

28  here are qualitatively significant, because, for instance, the CEO of CSC was stealing money from
the company.

United States District Court

For the Northern District of California

1    violation of GAAP may support a plaintiff's claim of fraud," a plaintiff must show "how the

2    adjustments affected the company's financial statements and whether they were *material in light of*

3    *the company's overall financial position*") (emphasis added).

4         In fact, Nazif admitted in his summary judgment opposition that he "testified that he had

5    personal experience with approximately $15 million of misstatements" by CSC before he was

6    terminated.[8]  Opp. Br. at 17.  That is, Nazif testified at his deposition that he apparently believed that

7    the aggregate effect of the various accounting flaws he identified on CSC's overall revenues would

8    have been approximately $15 million.  *See id.*  By any measure, no objectively reasonable

9    accountant could have believed that a revenue misstatement of  "approximately $15 million" was

10   sufficiently material to corporation as large as CSC to warrant a colorable suspicion of securities

11   fraud.  Moreover, the Court observes that Nazif: (1) presented no evidence that any of the alleged

12   GAAP violations he reported were widespread accounting problems at CSC as opposed to isolated

13   incidents; (2) admits that he had no knowledge at the time he was terminated whether any of the

14   alleged accounting issues were widespread; and (3) conceded at his deposition that at least some of

15   the GAAP "violations" that he identified to Sweeney and Hand are not clear-cut violations of GAAP

16   – rather they would only be considered "violations" by someone who agreed with Nazif's

17   interpretation of what GAAP requires.  *See* Nazif Depo. at 255:19-256:1 (agreeing that "whether an

18   enhancement is properly capitalized" is a "matter of interpretation that requires some amount of

19   judgment and accounting expertise"); *see also* LeGraverend 30(b)(6) Depo. at 64:15-65:1 (CSC's

20   accounting expert testified that while Nazif's interpretation of GAAP vis-a-vis software

21   capitalization was not "unreasonable," there is room for debate because there are "few details in

22   [GAAP's] guidance on that specific topic").  Put simply, no reasonable juror could find that an

23

24   _____

25        [8]  Plaintiff speculates that the amount of any misstatement "might be much larger given his
     limited exposure" to CSC's accounting practices, but this surmise is irrelevant.  The question before
26   the Court is whether Nazif engaged in protected activity at the time he told Hand and Sweeney about
     CSC's alleged GAAP problems.  Nazif does not claim (and has submitted no evidence that would
27   indicate) that he told Hand and Sweeney that there could be *additional* misstatement problems
     lurking in the ether.  Nazif's claim is simply that he was terminated for reporting known GAAP
28   violations which allegedly totaled $15 million.

1    objectively reasonable accountant in Nazif's position would have suspected CSC was guilty of

2    securities fraud.

3        By way of comparison, the Court recounts the evidence that the Ninth Circuit found

4    sufficient to survive summary judgment on the plaintiffs' SOX claim in *Van Asdale*.  *See Van*

5    *Asdale*, 577 F. 3d at 1001 (holding that plaintiffs' claims survived summary judgment because they

6    had submitted evidence to support a "theory of fraud [that] approximates a securities fraud claim").

7    The *Van Asdale* plaintiffs were intellectual property attorneys at defendant International Game

8    Technologies (IGT).  *Id.* at 991.  At some point IGT merged with another gaming company, Anchor

9    Gaming.  *Id.* at 993.  One of the main assets that Anchor brought to the merger was a patent that

10   covered most of IGT's slot machines; machines which "generate[d] a substantial portion of IGT's

11   total income."  *Id.* at 1001.  One IGT employee described the patent as "the Crown Jewel of IGT's

12   intellectual property portfolio."  *Id.*

13       Sometime after the merger, plaintiffs claimed they discovered that Anchor had known all

14   along (*i.e.*, pre-merger) that the relevant patent was invalid.  *Id.* at 993.  While plaintiffs never used

15   the words "fraud," stock fraud, or similar, they told certain IGT executives that Anchor was "aware"

16   of the invalidating prior art, "had not disclosed it prior to the merger, and that 'there's a possibility it

17   could go to the top.'"  *Id.* at 993.  Shortly after plaintiffs revealed this information to their superiors,

18   they were fired.  *Id.*

19       The Ninth Circuit held that the above allegations were sufficient to present a triable issue of

20   fact for the jury.  Specifically, the panel found that it was "clear" that the withheld prior art was

21   material because it arguably invalidated the "Crown Jewel" of the acquiring company's patent

22   portfolio, and plaintiffs had further informed management that "the merger would not have occurred

23   if IGT had been made aware of the [prior art]."  *Id.* at 1001.  Moreover, "[g]iven the potential

24   importance of the [prior art] and related documents, the top management positions at IGT occupied

25   by several former Anchor officials, and their alleged financial motives favoring nondisclosure, we

26   hold that it was objectively reasonable for [plaintiffs] to suspect that the non-disclosure of the [prior

27   art] prior to the merger could have been deliberate."  *Id.*

28

United States District Court

For the Northern District of California

Nazif has cited insufficient evidence to support any claim of materiality, and unlike in *Van Asdale*, a reasonable inference of materiality is not obvious when viewing the facts in the light most favorable to Nazif.  At best, a jury could conclude that Nazif reported "minor or technical" GAAP violations to his superiors.  *See In re Daou Systems*, 411 F.3d at 1017.  This is insufficient to state a valid primae facie claim under Sarbanes-Oxley.

Plaintiff's alternative argument fares no better.  In addition to arguing that CSC violated the securities laws by misstating certain accounting figures in violation of GAAP, Nazif claims he informed Hand and Sweeney that CSC's failure to maintain a "global contract database" was an "inadequate internal control" under GAAP.  Nazif Decl. at ¶ 28.  Specifically, he claims that CSC's failure to maintain a global contract database violated the "books and records" provision of the Exchange Act, although he admits he did not say as much to either Sweeney or Hand.  *See* 15 U.S.C. § 78m(b)(2) (requiring public companies to "devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that . . . transactions are recorded as necessary to . . . permit preparation of financial statements in conformity with [GAAP] . . . and [] to maintain accountability for assets").

Section 78m (the "books and records" provision) does not require or protect any disclosures in its own right.  Thus, the only way Nazif's complaint about inadequate record keeping could be "protected" under SOX (as it must be to state a claim under Dodd Frank) is if the books and records provision is construed as one "relating to fraud against shareholders."  *See* 18 U.S.C. § 1514A (prohibiting retaliation against an employee who provides information "regarding any conduct which the employee reasonably believes constitutes a violation of . . . any provision of Federal law relating to fraud against shareholders").  But even assuming that Nazif's report of books and records violations *could* be protected under SOX, Nazif's books and records claim nevertheless fails for the same reason his other DFA claims fail; Nazif has not made any showing that an objectively reasonable individual in his position would have believed that CSC's failure to maintain a "global contracts database" was potential evidence of "fraud against shareholders."  Stated differently, Nazif presented no evidence that would indicate that CSC's apparent failure to maintain a "global contracts database" could (and actually did) result in the publication or dissemination of materially

United States District Court

For the Northern District of California

1   misleading or inaccurate financial statements.  Rather, Nazif simply speculates that such

2   misstatements possibly could have occurred.

3          As both the ARB and Second Circuit have recognized, "'[i]t may well be that a

4   complainant's complaint concerns such a trivial matter', in terms of its relationship to shareholder

5   interests, 'that he or she did not engage in protected activity under § 1514A.'" *Nielsen*, 762 F.3d at

6   222 (quoting *Sylvester*, 2011 WL 2165854, at *19) (internal modification omitted).  This is such a

7   case.  CSC is entitled to summary judgment on Nazif's Dodd Frank whistleblower retaliation claim.

8   C.     Nazif's California Labor Code Claim Fails

9          Nazif's operative complaint contains claims for retaliatory termination brought under both

10  California Labor Code sections 1102.5(b) and (c).  SAC at ¶¶ 28-33.  Nazif did not oppose CSC's

11  summary judgment motion regarding his section 1102.5(b) claim – Nazif admits he did not report

12  alleged wrongdoing to any "government or law enforcement agency" before he was fired, and such

13  an external report is a necessary predicate for a section 1102.5(b) claim.  *See* Cal. Lab. Code

14  1102.5(b) (prohibiting an employer from retaliating against an "employee for disclosing information

15  . . . to a government or law enforcement agency"); *see also Weingand v. Harland Financial*

16  *Solutions, Inc.*, No. 11-cv-3109 EMC, 2012 WL 3537035, at *4 (N.D. Cal. Aug. 14, 2012) (noting

17  that Labor Code section 1102.5(b) "does not apply to plaintiff because he only reported his concerns

18  to a private employer, rather than a public agency").

19         Nazif *does* oppose CSC's summary judgment motion with respect to his section 1102.5(c)

20  claim, however.  "To establish a prima facie case under section 1102.5, Plaintiffs must offer proof

21  that (1) they engaged in a protected activity, (2) Defendant subjected them to adverse employment

22  actions and (3) there is a causal link between the two."  *Casissa v. First Republic Bank*, No. 09-cv-

23  4129, 2012 WL 3020193, at *9 (N.D. Cal. July 24, 2012) (citing *Mokler v. Cnty. of Orange*, 157

24  Cal. App. 4th 121, 138 (2007)).  There is no dispute Nazif satisfies the second prong, and the Court

25  assumes without deciding that he could satisfy the third prong as well.  Nevertheless, Nazif's

26

27

28

15

United States District Court

For the Northern District of California

1  retaliatory termination claim fails because he has not produced any evidence to suggest that he

2  "engaged in a protected activity" as that term is used in section 1102.5.[9]

3      Section 1102.5(c) "forbids an employer from taking retaliatory action against an employee

4  for 'refusing to participate in an activity that would result in a violation of state or federal law, or a

5  violation or noncompliance with a state or federal rule or regulation.'" *Casissa*, 2012 WL 3020193,

6  at *8 (quoting Cal. Lab. Code § 1102.5(c)).  As Judge Wilken has explained, the Legislature enacted

7  the statute "to protect employees who refuse to act at the direction of their employer or refuse to

8  participate in activities of an employer that would result in a violation of law." *Id.* (internal

9  quotation marks and citation omitted).

10      Here, Nazif has presented no evidence that he refused "to participate in an activity that

11  would result in a violation of state or federal law, or a violation or noncompliance with a state or

12  federal rule or regulation." Cal. Lab. Code § 1102.5(c).  Indeed, the only activity Nazif claims that

13  he refused to participate in was Hand's instruction to "rubberstamp" certain software development

14  capitalization costs.[10]  *See* Opp. Br. at 20.  *See* Nazif Decl. at ¶¶ 25-26 (stating that Hand "wanted

15  me to coach the business unit into including information that would qualify the cost to be

16  capitalized, regardless of whether it should be.  She told me that we should be rubberstamping these

17  capitalization costs.  I refused to do so, and she reassigned the work").  But even assuming, as this

18  Court must, that Nazif refused to "rubberstamp" these capitalization costs, that is not sufficient to

19  state a claim under section 1102.5(c) because Nazif has not established that "rubberstamping"

20  capitalization costs "would result in a violation of state or federal law." *See* Cal. Lab. Code §

21  1102.5(c).

22

23      [9]  Defendant argues in the alternative that this claim fails because Nazif did not exhaust his

24  administrative remedies.  This Court rejected a similar argument in *Melgar v. CSK Auto, Inc.*, No.
   13-cv-3769 EMC, 2014 WL 546915 (N.D. Cal. Feb. 7, 2014).  The Court will not revisit that

25  decision here, because it finds that CSC is entitled to summary judgment on Nazif's retaliatory
   termination claim in any event.

26      [10]  One could potentially read Nazif's complaint to allege that he refused to participate in any

27  of the allegedly improper accounting practices he claims he identified to Hand and Sweeney.  But
   even construing Nazif's complaint in this way, Nazif has no viable claim under section 1102.5(c)

28  because he identifies no federal or state law that was violated by any of the accounting practices he
   refused to endorse.  Instead, Nazif alleges simply that such accounting practices violate GAAP.

United States District Court

For the Northern District of California

Indeed, Nazif testified at his expert deposition that he was not aware of any state or federal law that speaks to, or regulates, the proper accounting treatment for the capitalization of software development costs.  Nazif Expert Depo. at 314:9-317:10.[11]  Instead, Nazif testified that Hand's behavior vis-a-vis software capitalization costs was in violation of GAAP.  *See* Nazif Expert Depo. at 316:21-24 (Q: To your knowledge, does the situation that you just described [regarding software capitalization] constitute noncompliance with state or federal rules of regulations? A: As I mentioned, based on against [sic] the GAAP.).  As a number of courts have recognized, however, violations of GAAP are not necessarily violations of law.  *See Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1020-21 (5th Cir. 1996).  As the Fifth Circuit explained, "[t]he term 'generally accepted accounting principles,' as we have often noted, is a term of art encompassing a wide range of acceptable procedures, such that 'an ethical, reasonably diligent accountant may choose to apply any of a variety of acceptable accounting procedures when that accountant prepares a financial statement."  *Id.* at 1021 (citing *Fine v. American Solar King Corp.*, 919 F.2d 290, 297 (5th Cir. 1990)).  Thus, as the Ninth Circuit has recognized, the "'mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish'" a violation of the securities (or any other) laws.  *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 390 (9th Cir. 2002) (quoting *In re Software Toolworks Inc.*, 50 F.3d 615, 627 (9th Cir. 1994)); *see also Lovelace*, 78 F.3d at 1020; *In re Daou Systems*, 411 F.3d at 1017 (holding that "minor or technical" violations of GAAP typically cannot typically undergird a securities fraud claim).

Indeed, Nazif's section 1102.5(c) claim is particularly defective because Nazif has made no effort to establish that any of the GAAP violations that he refused to condone ever resulted in incorrect figures being *published* in a CSC financial statement or otherwise disseminated to investors or other company outsiders.  Nor has Nazif attempted to prove the number of GAAP violations that occurred, or that any potential GAAP violation that was reported to investors was material.  *See* Section 3.B, *supra*.  Thus, even though Nazif argues that one can infer that he refused

---

[11]  The Court also notes that Nazif further testified that the proper accounting of software development costs is open to at least some interpretation under GAAP.  Nazif Depo. at 255:19-256:1 (agreeing that "whether an enhancement is properly capitalized" is a "matter of interpretation that requires some amount of judgment and accounting expertise").

United States District Court

For the Northern District of California

1    to violate certain (unidentified) federal or state laws that prohibit making false entries in certified

2    accounting statements, there is no evidence in the record before this Court that the specific conduct

3    Nazif refused to participate in ever resulted in the publication of inaccurate accounting statements or

4    the violation of any specific law.  Without such evidence, Nazif cannot make out a prima facie case

5    for retaliatory termination under California law.

6            In fact, Magistrate Judge James recently rejected a claim brought under Labor Code section

7    1102.5(c) where the plaintiff, like Nazif, argued that they had refused to participate in the "falsifying

8    of financial and/or accounting statements" where they refused to go along with alleged GAAP

9    violations.  *Dauth v. Convenience Retailers, LLC*, No. 13-cv-47 MEJ, 2013 WL 5340396, at *2

10   (N.D. Cal. Sept. 24, 2013).  As Judge James recognized, a plaintiff "must specify the law, rule, or

11   regulation that supports her claim" in order to "establish a *prima facie* case for violation of section

12   1102.5(c)."  *Id.*  The court concluded that "Plaintiff's reliance on GAAP is . . . insufficient."  *Id.*

13   This was so because "[w]hile GAAP may provide mandatory accounting reporting requirements,

14   Plaintiff has not cited any authority indicating that GAAP regulations equate to state or federal

15   statutory or regulatory law.  Notably, as Defendants point out and as Plaintiff acknowledges, GAAP

16   procedures are issued by the FASB – an independent private sector organization – not a state or

17   federal entity.  In fact, as Defendants correctly argue, courts have recognized that GAAP does not

18   establish mandatory procedures, but a 'wide range of acceptable procedures' that an accountant may

19   choose to apply when the accountant prepares a financial statement."  *Id.* (quoting *Reiger v. Alrtis

20   Software, Inc.*, 1999 WL 540893, at *6 (S.D. Cal. Apr. 30, 1999)).

21           In his opposition brief, Nazif writes that he "observed numerous violations of GAAP which

22   he believed (and are) [sic] violations of federal and state securities laws and regulations, including

23   without limitation, the DFA, Sarbanes-Oxley, Rule 10b-5, and the books and records provisions of

24   the '34 Act."  Opp. Br. at 24.  Notably, this sentence is not followed by any citation, and the Court

25   has identified no provision of either federal or state law that *prohibits* the mere act of capitalizing

26   software development costs in a manner inconsistent with GAAP, or otherwise failing to comply

27   with GAAP in all circumstances regardless of materiality.  Nor does Nazif cite any case where a

28   plaintiff who refused to endorse a GAAP violation, without more, was held to state a claim under

1   section 1102.5(c).  Like the plaintiff in *Dauth*, Nazif has not cited any "authority indicating that a

2   failure to follow a GAAP procedure, standing alone, constitutes a violation of federal or state law."

3   *Dauth*, 2013 WL 5340396, at *2.  Thus, CSC is entitled to summary judgment on this claim.

4   D.    Nazif's Wrongful Termination in Violation of Public Policy Claim Fails

5          Nazif's final claim alleges that he was wrongfully terminated in violation of public policy.

6   "A claim for wrongful termination in violation of public policy must be based on a fundamental

7   policy established by a constitutional, statutory or regulatory provision."  *Casissa*, 2012 WL

8   3020193, at *11 (citing *Green v. Ralee Eng'g Co.*, 19 Cal. 4th 66, 76 (1998)).

9          Here, the statutory provisions that Nazif alleges CSC violated when it terminated him are

10  Dodd Frank's whistleblower-protection provision and Labor Code section 1102.5.  As discussed

11  above, Nazif has not presented sufficient evidence to proceed to the jury on either of these claims.

12  There is no genuine issue of disputed fact as to whether Nazif engaged in "protected activity" under

13  either statute.  Thus, his wrongful termination in violation of public policy claim must similarly fail.

14  *See Casissa*, 2012 WL 3020193, at *11 ("To the extent that Plaintiffs' *Tameny*[12] causes of action rest

15  on the fundamental policy established by section 1102.5(c), these claims fail for the same reason that

16  Plaintiffs have failed to establish a prima facie case for violations of this section.").

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27

28

---

[12] Wrongful termination in violation of public policy claims are often "referred to as *Tameny* claims, after the decision in *Tameny v. Atlantic Richfield Co.* . . . ."  *Id.*

19

# IV.   CONCLUSION

Viewing the evidence in the light most favorable to Nazif, it is plain that he reported only minor or technical violations of GAAP to CSC.  CSC is therefore entitled to summary judgment because Nazif has not presented evidence from which a reasonable jury could find that he engaged in protected activity under either the DFA or the Labor Code.

This order disposes of Docket Nos. 66, 67, and 71.

IT IS SO ORDERED.

Dated:  June 17, 2015

_____
EDWARD M. CHEN
United States District Judge